## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| YITZHAK SAFRA | : | |
| Aharon Fishel 19 | | |
| Jerusalem, Israel, | : | |
| | | |
| NATAN SAFRA | : | |
| Aharon Fishel 19 | | |
| Jerusalem, Israel, | : | |
| | | |
| and | : | |
| | | |
| YISRAEL SAFRA | : | |
| Aharon Fishel 19 | | |
| Jerusalem, Israel | : | |
| | | |
| Plaintiffs, | : | |
| | | |
| v. | : | Civil Action No.: _____ |
| | | |
| THE PALESTINIAN AUTHORITY | : | |
| (a/k/a The Palestinian Interim | | |
| Self-Government Authority) | : | |
| 1732 Wisconsin Avenue, NW | | |
| Washington, DC 20007 | : | |
| | | |
| **Serve On:** | : | |
| Maen Rashid Areikat | | |
| 1732 Wisconsin Avenue, NW | : | |
| Washington, DC 20007, | | |
| | : | |
| Defendant. | | |

\* \* \* \*  ooo0ooo  \* \* \* \*

## COMPLAINT AND PRAYER FOR JURY TRIAL

Yitzhak Safra, Natan Safra, and Yisrael Safra, by and through their undersigned counsel,

sue the Palestinian Authority (also known as The Palestinian Interim Self-Government

Authority), and allege:

## Introduction

1.      On April 24, 2011, in a machine-gun attack near the West Bank city of Nablus, officers and employees of the Defendant Palestinian Authority wounded brothers Yitzhak and Natan Safra, in an act of International Terrorism.  Yitzhak and Natan Safra, together with their father, Yisrael Safra, bring this civil action pursuant to the federal Antiterrorism Act, 18 U.S.C. §§ 2331 *et seq.,* and supplemental common law causes of action.

## Parties

2.      Plaintiffs Yitzhak, Natan, and Yisrael Safra are, and have been since birth, United States citizens.

3.      Defendant Palestinian Authority (a/k/a The Palestinian Interim Self-Government Authority) (hereinafter "PA") is and at all relevant times was, a non-sovereign government that provided certain governmental services in parts of the West Bank, and a legal person as defined in 18 U.S.C. § 2331(3).

## Subject-Matter Jurisdiction

4.      This Court has subject-matter jurisdiction pursuant to 18 U.S.C. §§ 2331 *et seq.*, and 28 U.S.C. § 1367(a).  All claims in this case arise from a single nucleus of operative facts— the April 2011 terrorist attack.

## Personal Jurisdiction

5.      Because Defendant PA is a governmental entity, it is not a "person" within the meaning of the Due Process clause of the Fifth Amendment.  Therefore, this Court acquires and may exercise personal jurisdiction over the PA if service of process was properly effectuated.

6.      In the alternative, because Defendant PA operates an office and maintains a staff of employees in the United States, conducts extensive public relations and other activities

throughout the United States, and as a direct result of such activities receives hundreds of millions of dollars in aid from the United States each year, this Court has personal jurisdiction over the PA pursuant to 18 U.S.C. § 2334(a) and Federal Rule of Civil Procedure 4(k).

7.      As a result of the contacts alleged above, Defendant PA received from the United States, $440 million in aid in FY2014, $426.7 million in FY2013, $495.7 million in FY2012, $545.7 million in FY2011, $500.4 million in FY2010, and $980.7 million in FY2009, a total of nearly $3.4 billion over the course of the past six years.

8.      Based on these significant contacts, this Court has held that Defendant PA is subject to the general personal jurisdiction of the courts of the United States, *Klieman v. Palestinian Authority*, 547 F. Supp. 2d 8 (D.D.C. 2008), as has every other federal court that has decided the issue. *Sokolow v. Palestine Liberation Organization*, No. 04-0397, 2011 WL 1345086 (S.D.N.Y. June 2, 2011); and *Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15 (D.R.I. 2004).

9.      The PA continues to engage in the same extensive activities in the United States found in *Klieman*, *Sokolow*, and *Ungar*, and has expanded its contacts since then by providing services in the United States related, among other things, to real estate and corporate registration in the West Bank.  Maen Rashid Areikat, appointed by PA President Mahmoud Abbas, serves as the PA's' official representative to the United States and directs and supervises  the other PA appointees who work at the offices located at 1732 Wisconsin Avenue NW, Washington, DC 20007.

10.     Furthermore, this Court can exercise specific jurisdiction over the PA because, as discussed below, the terrorist attack from which this action arises was part and parcel of the PA's general practice of using terrorism to influence United States public opinion and policy.  The PA

also uses its Washington, DC office and staff to influence United States foreign policy and aid.
Because the PA's course of conduct was targeted at the United States, and because that course of
conduct included extensive public relations and propaganda activities in the United States, the
Court can exercise specific jurisdiction over the PA as an additional basis of personal
jurisdiction.

## Facts Common to All Counts

### The Terrorist Attack

11.    Early on the morning of April 24, 2011, during the Jewish holiday of Passover,
Yitzhak and Natan Safra, joined by 15 other worshippers, visited Joseph's Tomb, a Jewish holy
site located near the West Bank city of Nablus, to pray.  Neither Yitzhak Safra, nor Natan Safra,
nor any of the other worshippers were armed.

12.    The worshippers, including Yitzhak and Natan Safra, entered the building that
houses Joseph's Tomb to pray, while two of their companions waited in the vehicles.

13.    Just seconds after Yitzhak Safra, Natan Safra, and the other worshippers entered
the building, without warning or provocation, PA security forces led by Sergeant Mohammed
Saabneh began firing their automatic weapons.

14.    At the sound of the gunfire, Yitzhak Safra, Natan Safra, and the other worshippers
immediately raced out of the tomb and ran to their vehicles, attempting to drive off.

15.    As the vehicles were attempting to leave, Saabneh announced to the other PA
security personnel that he intended to fire at the vehicles with the intention of causing death.
Shouting "*Allahu Akbar*!" ("God is great" in Arabic), he and fellow PA security forces member
Salah Hamed fired their automatic weapons on the worshippers' vehicles at close range.  Yitzhak
and Natan Safra were in the back seat of the first car to be hit by the barrage of gunfire.  As

4

bullets grazed the heads of the worshippers in the front of the vehicle, injuring at least one of them, three bullets wounded Yitzhak Safra in the shoulder and Natan Safra suffered an injury to his hip from a bullet.  Another worshipper in the back seat was shot in his abdomen.

16.     One of Saabneh's subordinates, Noaf Wael, then opened fire at close range on one of the other vehicles attempting to leave the site.  The bullets penetrated the windshield and struck another worshipper, Ben-Yosef Livnat in the neck, ultimately causing his death.

17.     Both Yitzhak Safra and Natan Safra were taken to the hospital following the machine-gun attack where medical staff operated on Yitzhak Safra's wounded shoulder.  Yitzhak Safra underwent a second operation on his shoulder some time later.

18.     In addition to their physical injuries, Yitzhak Safra and Natan Safra suffered great conscious pain, shock, and physical and mental anguish.  Natan Safra sat next to and witnessed his brother being struck by bullets.

19.     Because of his sons' injuries and traumatic experiences, Yisrael Safra has suffered emotionally.

20.     Immediately following the attack, after the Jewish worshippers had left the site, the PA security forces, under orders from Saabneh, attempted to cleanse the crime scene of evidence of the shooting, replacing the spent shell casings with rocks. This was done with and for the express purpose and intention of obstructing any future investigation into the event and its perpetrators and to make it appear that the PA security forces had been attacked by rock-throwing Jewish worshippers.

**The PA's Responsibility for the Attack**

21.     The PA selected and employed the security forces, including Saabneh, posted at Joseph's Tomb. Although knowing – indeed, because of its knowledge – that Saabneh was a

twice-convicted terrorist (as alleged more fully below), the PA has financially supported him and continued to employ him for many years, including during his incarceration in an Israeli prison for his terrorist activities, and chose Saabneh to lead the security forces at Joseph's Tomb.

22.     In 2004, the PA hired Saabneh as a security officer in the PA's security forces.

23.     In June of the following year, Israeli authorities arrested Saabneh and charged him with supplying bomb-making components to operatives of two different terrorist organizations designated by the United States as "Foreign Terrorist Organizations" and "Specially Designated Global Terrorists": Palestine Islamic Jihad and the al-Aqsa Martyrs' Brigades.  Saabneh pled guilty to these charges and, in August 2005, an Israeli court sentenced him to 20 months in prison.

24.     Upon information and belief, based upon the facts alleged herein, the PA continued to (i) employ Saabneh as a security officer following his conviction by Israel, rather than dismiss him, and (ii) provide Saabneh and his family with financial benefits during his incarceration.

25.     Following his release from prison in December 2006, Saabneh returned to active duty with the PA's security forces.

26.     Saabneh also returned to his terrorist activities.   In March 2007, just a few months following his release, Israeli authorities again arrested Saabneh for his involvement with terrorist organizations.  An Israeli court determined that Saabneh was engaged in "activity that endangers the security of the region and public security" and ordered that he be detained in custody until September 2007.  Specifically, the court found:

> [U]p-to-date, credible and quality intelligence information . . . indicates a definite concern for the security of the region if [Saabneh] is released, and the involvement of [Saabneh] in current activity . . . endangers the security of the region and public security. . . . [I]n these circumstances the administrative

detention of [Saabneh] is a necessary and even mandatory step in order to protect the security of the region and the public security.

27.     An appellate court that denied Saabneh's appeal observed that he "shows great determination to engage in unlawful actions" and that he "presents a great danger."  Because of Saabneh's extensive ties to known terrorist groups and his quick return to terrorist activities after having been released from Israeli prison in December 2006, Israeli courts ultimately extended the length of his detention to July 2008.  These facts were all known to the PA.

28.     Upon information and belief, based upon the facts described herein, throughout this second period of incarceration, the PA continued to employ Saabneh as a security officer and continued to provide him and his family with financial benefits.  Indeed, Saabneh's attorney emphasized Saabneh's current status as a PA police officer at various court hearings concerning his detention.

29.     Once again, the PA welcomed Saabneh back to active duty following his release from prison in July 2008.

30.     At some point between July 2008 and April 2011, the PA promoted Saabneh to the rank of sergeant.  Saabneh had only served in active duty outside of prison for approximately three-and-a-half years.  Upon information and belief, in calculating his seniority in connection with his promotion to sergeant, the PA included the time Saabneh spent serving his prison sentences for terrorist activities.

31.     After promoting Saabneh upon release from his second prison term, the PA chose to place him at Joseph's Tomb.

32.     In selecting Saabneh to lead the security forces at Joseph's Tomb, the PA knowingly and intentionally armed a known terrorist with an automatic weapon, placed him in command of at least three other PA security officers, and stationed him in one of the few areas

where he would be sure to encounter the very people he had worked to kill and injure through his previous terrorist activities: Jews.

33.     The vast majority of PA security officers serve exclusively within Palestinian cities and villages, where they have minimal contact with Jews. It is widely known that Joseph's Tomb is a Jewish religious site that is visited by many Jews, and that because of its religious significance to Jews and its location within PA-controlled territory, it is one of the few locations in the entire West Bank where PA security officers routinely come into contact with Israeli and Jewish civilians.  Thus, Joseph's Tomb was a uniquely sensitive and potentially volatile location, and an extremely dangerous place to post an armed security officer, such as Saabneh, who had an extensive history of anti-Israel terrorist activity.

34.     Given Saabneh's well-known background of anti-Israel terrorist activity, no rational actor would give Saabneh a machine-gun and command authority, especially at a sensitive site such as Joseph's Tomb, where he would be certain to come into contact with Jewish Israelis, unless it wanted and expected the Jewish visitors to the site to be attacked.

35.     Therefore, the PA's conduct in promoting Saabneh to the rank of sergeant following his second release from Israeli prison and placing him at Joseph's Tomb, either intentionally incited terrorist attacks such as the April 24, 2011 shooting attack, or, at the very least, recklessly laid the foundation for a foreseeable act of terrorism against Jews attempting to worship at the holy site.

**The PA's Policy and Practice of Inciting Terrorism**

36.     The PA's decision to employ, promote, and arm a twice-convicted terrorist and place him in one of the few locations where he would routinely and foreseeably come into

contact with Jews did not occur in a vacuum.  Rather, this decision was in accordance with the

PA's policy and practice of encouraging acts of violence and terror against Israelis and Jews.

37.     First, the PA has worked to increase the number of convicted terrorists in its

security forces and to promote these terrorists to positions of power.  The PA has accomplished

this by continuing to employ and provide financial benefits to its security officers after they have

been arrested and imprisoned by Israel for engaging in terrorist activities, and by including time

served in Israeli prisons for terrorism-related offenses in calculating seniority when promoting

security personnel to higher–ranking, supervisory positions.  In other words, the longer a

terrorist's prison sentence, the higher his rank and the greater his authority will be upon joining

or rejoining the PA's security services.

38.     Second, the PA has rewarded and encouraged acts of terrorism against Israelis

and Jews by operating both the Ministry of Detainees, which pays financial benefits to

Palestinians imprisoned for terrorist activity and their families, and the Institute for the Care of

Martyrs' Families and the Injured (also referred to as the Fund, the Foundation, or the

Establishment for the Care of Martyrs' Families) (hereinafter "the Terrorist Fund"), a program

that provides financial and other benefits to the families of terrorist who die in suicide attacks

committed against Israelis and Jews.

39.     As recently as October 29, 2012, PA Minister of Detainees and Ex-Detainees

Affairs, Issa Qaraqe, stated that the PA's policy of providing support to convicted terrorists and

their families is "part of the law system and the national and cultural values of the Palestinian

National Authority."  In addition, in an April 17, 2011 interview, Director General of the

Ministry of Detainees Sa'd Nimr stated that the Palestinian security prisoners serving time in

Israeli jails for terrorist offenses were just "doing their duty" to resist the occupation.

40.     According to the World Bank, the Terrorist Fund does not serve charitable or social welfare-based goals or needs: "[t]he program is clearly not targeted to the poorest households . . . the level of resources devoted to the Fund for Martyrs and the Injured does not seem justified from a welfare or fiscal perspective."  Indeed, in December 2010, Yousef Ahmed Jubran, the director of the Terrorist Fund from 1996 to 2006, testified in an Israeli court that the PA gives the families of suicide terrorists financial benefits because it considers them to be "martyrs" who meet their deaths "in the course of the struggle, the fighting, the conflict." Through its Terrorist Fund, the PA has paid benefits to the families of many suicide terrorists, including those who have murdered and injured United States citizens.

41.     Third, the PA publicly honors and glorifies terrorists for their violent acts against Jews and Israelis by naming landmarks and events after Palestinian terrorists.  For example, just a few days before the Joseph's Tomb attack, the PA dedicated a tree in Bethlehem to all 73 Palestinian prisoners from Bethlehem serving life sentences for terrorism-related activities.  In March 2011, the PA honored terrorist Dalal Mughrabi, who died carrying out a bus hijacking in which 37 civilians were killed, including young children, by naming a square in Ramallah after her.  In the summer of 2011, PA Prime Minister Salam Fayyad sponsored a summer camp and divided the children into three groups, each group named after a known Palestinian terrorist. These are just a few examples of the many ways in which the PA glorifies terrorists as heroes.

42.     Fourth, the PA has regularly used its educational system and government-operated media to demonize and incite violence against Israelis and Jews.  The PA publishes and distributes textbooks through its schools that are filled with anti-Israel, and frequently anti-Semitic, messages.  The PA broadcasts programs on its government-operated media outlets glorifying and honoring convicted terrorists.  In addition, the PA, through its leaders and

spokesmen, regularly uses government-operated media (television and radio stations and the daily newspaper *al-Hayat al-Jedida*) and appearances in other media outlets to disparage Jews and Israelis based on their ethnicity and citizenship, and to praise, encourage, and incite the use of violence and terrorism against Jews and Israelis.  Members of the PA's leadership frequently refer to terrorist attacks targeting innocent civilians as examples of honorable "resistance" and to the terrorists who perpetrated those attacks as heroes.

**The PA Ratified the April 24, 2011 Shooting Attack at Joseph's Tomb**

43.     Just hours after the April 24, 2011 machine-gun attack that injured YitzhakSafra and Natan Safra, and murdered fellow worshipper Benyo Livnat, PA Brigadier General Adnan Damiri, an official spokesman for the PA, was interviewed on Israel Radio.  Asked whether the PA would apologize for the murder of Benyo Livnat, Damiri responded by justifying the murderous attack on the grounds that: (a) the victims, including Yitzhak and Natan Safra, were "settlers" and not "normal people," and thus somehow less than human; (b) their presence in areas that the PA considers to be Palestinian territory is illegitimate; and (c) Palestinians in a nearby town were purportedly attacked in the past by other, unrelated Jewish "settlers."

44.     In a May 23, 2013 interview with the Palestinian newspaper *al-Ayyam*, conducted after Israel had arrested three of the perpetrators of the machine gun attack, Damiri reiterated these sentiments, claiming that the PA security officers had acted in self-defense.

45.     As an official PA spokesman, Brigadier General Damiri's statements justifying the attack and vilifying the victims are evidence of the PA's ratification of the attack.  Other PA officials have made similar statements.  For example, Major General al-Bakri was quoted in *al-Ayyam* as stating that the PA security forces at Joseph's Tomb were "carrying out their duty."

**First Claim for Relief**
**On Behalf of All Plaintiffs:**

**Action for International Terrorism Pursuant to 18 U.S.C. § 2333(a)**

46.     Plaintiffs repeat and incorporate the allegations contained in the previous paragraphs as though fully set forth and realleged herein.

47.     The April 24, 2011 attack described above constitutes an act of International Terrorism within the meaning of 18 U.S.C. § 2333.

    a.     The unprovoked shooting of unarmed worshippers was dangerous to human life (and, indeed, endangered the lives of Yitzhak and Natan Safra and took the life of fellow worshipper Ben-Yosef Livnat) and would have been a violation of the criminal laws of the United States and of each and every one of its States had it been committed in the jurisdiction of the United States or of any State.

        i.     The PA's conduct constitutes reckless endangerment, which violates the criminal laws of thirty-four states:  Ala. Code § 13A-6-24; Alaska Stat. § 11.41.250; Ariz. Rev. Stat. Ann. § 13-1201; Ark. Code. Ann. §§ 5-13-204-206; Colo. Rev. Stat. § 18-3-208; Conn. Gen. Stat. §§ 53a-63 to 64; Del. Code Ann. tit. 11, §§ 603-604; Fla. Stat. § 784.05; Ga. Code Ann. § 16-5-60(b); Haw. Rev. Stat. §§ 707-713 to 714; 720 Ill. Comp. Stat. 5/12-5; Ind. Code Ann. § 35-42-2-2(b); Ky. Rev. Stat. Ann. §§ 508.060-.070; Me. Rev. Stat. Ann. tit. 17-A, §§ 211, 213; Md. Code Ann. Crim. Law § 3-204; Mo. Rev. Stat. § 565.070(1)(4); Mont. Code Ann. § 45-5-208; Nev. Rev. Stat. Ann. § 202.595; N.H. Rev. Stat Ann. § 631:3; N.J. Stat. Ann. § 2C:11-4(b)(1); N.Y. Penal Law §§ 120.20-.25; N.D. Cent. Code § 12.1-17-03; Ohio Rev. Code Ann. § 2903.041; Or. Rev. Stat. § 163.195; 18 Pa. Cons. Stat.

§ 2705; S.C. Code Ann. § 16-3-60; S.D. Codified Laws § 22-16-20; Tenn.
Code Ann. § 39-13-103; Tex. Penal Code Ann. § 22.05(a); Utah Code Ann.
§ 76-5-112; Vt. Stat. Ann. tit. 13, § 1025; Wash. Rev. Code § 9A.36.050;
Wis. Stat. § 941.30; Wyo. Stat. Ann. § 6-2-504.

ii.  Because it resulted in the death of Ben-Yosef Livnat, the PA's conduct also
constitutes manslaughter (including involuntary or second-degree
manslaughter) or negligent or reckless homicide in violation of federal law
and the laws of 49 states and the District of Columbia: 18 U.S.C. § 1112;
Ala. Code § 13A-6-3; Alaska Stat. § 11.41.120; Ariz. Rev. Stat. Ann. § 13-
1103; Ark. Code Ann. § 5-10-104; Cal. Penal Code § 192(b); Colo. Rev.
Stat. Ann. § 18-3-104; Conn. Gen. Stat. Ann. § 53a-56; Del. Code Ann. tit.
11, § 632; Fla. Stat. § 782.07; Ga. Code Ann. § 16-5-3(a), (b); Haw. Rev.
Stat. § 707-702; Idaho Code Ann. § 18-4006(2); 720 Ill. Comp. Stat. Ann.
5/9-3; Ind. Code Ann. § 35-42-1-5; Iowa Code Ann. § 707.5; Kan. Stat. Ann.
§ 21-5405; Ky. Rev. Stat. Ann. § 507.040; La. Rev. Stat. Ann. § 14:32; Me.
Rev. Stat. tit. 17-A, § 203; Mich. Comp. Laws §750.329; Minn. Stat.
§ 609.205; Miss. Code. Ann. § 97-3-47; Mo. Rev. Stat. § 565.024; Mont.
Code Ann. § 45-5-104; Nev. Rev. Stat. Ann. § 200.070; N.H. Rev. Stat.
Ann. § 630:2; N.J. Stat. Ann. § 2C:11-4; N.M. Stat. Ann. § 30-2-3; N.Y.
Penal Law § 125.15; N.D. Cent. Code § 12.1-16-02; Ohio Rev. Code Ann.
§ 2903.041; Okla. Stat. tit. 21, §716; Or. Rev. Stat. § 163.125; 18 Pa. Cons.
Stat. Ann. § 2504; S.C. Code Ann. § 16-3-60;S.D. Codified Laws § 22-16-
20; Tenn. Code Ann. § 39-13-215; Tex. Penal Code Ann. § 19.04; Utah

Code Ann. § 76-5-205; Wash. Rev. Code Ann. § 9A.32.070; Wis. Stat.

§ 940.06; Wyo. Stat. Ann. § 6-2-105; *Donaldson v. United States*, 856 A.2d

1068, 1073 (D.C. 2004); *Corbin v. State*, 52 A.3d 946, 960 (Md. 2012);

*Commonwealth v. DeMarco*, 830 N.E.2d 1068, 1073 (Mass. 2005); *State v.*

*Ortiz*, 824 A.2d 473, 485 (R.I. 2003); *State v. Viens*, 978 A.2d 37, 41-46 (Vt.

2009); *Noakes v. Com.*, 699 S.E.2d 284, 288 (Va. 2010); *State v. Crouch*,

730 S.E.2d 401, 403 (W. Va. 2012).

b.      Because the PA security forces opened fire on the worshippers as they

were fleeing, the shooting attack was intended to intimidate or coerce civilian Jews and Israelis

to stop visiting Joseph's Tomb and to stay out of PA-controlled territory.  Had the PA security

officers been motivated by an intent to secure the area from potential trespassers, they would

have issued warnings before shooting and, if they resorted to firing their weapons, they would

have fired as the worshippers were entering or still inside of the building, or they would have

fired into the air only, and not at the worshippers as they were fleeing.  Because the security

officers fired at the unarmed civilians as they were attempting to leave, it is clear that the

shooting attack was not intended to secure the area from trespassers.  Neither did the security

forces shoot in self-defense given that the worshippers were unarmed and fleeing.

c.      The shooting attack was also intended, through intimidation and coercion,

to influence the Israeli and United States governments' policies regarding the right of Israelis to

visit Jewish religious sites in the West Bank or to visit or live in the West Bank, as well as both

governments' policies regarding peace negotiations with the PA and Israel's continued presence

in the West Bank.

d.      The shooting attack occurred outside of the territorial jurisdiction of the United States.

48.      The brutal April 24, 2011 terrorist attack personally injured Plaintiffs Yitzhak and Natan Safra, as well as their father Yisrael Safra, all of whom are United States nationals.

a.      Yitzhak Safra was wounded in the shoulder by three bullets, requiring two rounds of surgery.  He also feared for his life as the barrage of bullets flew threw his vehicle.  He suffered and continues to suffer severe physical, psychological, and emotional injuries from the battery and assault he experienced.

b.      Natan Safra suffered an injury to his hip and was taken to the hospital following the machine-gun attack.  He feared for his life as the barrage of bullets ripped through his vehicle and bore witness to his brother being struck by the bullets and bleeding and suffering from his wounds.  Natan Safra, a minor at the time of the attack, suffered and continues to suffer severe physical, psychological, and emotional injuries from the battery and assault he experienced.

c.      Yisrael Safra is Yitzhak and Natan's father.  He suffered and continues to suffer severe physical, psychological, and emotional injuries from the battery and assault of his sons.

49.      As described above, the PA caused the battery and assault of Yitzhak and Natan Safra, and the resulting personal injuries of Yisrael Safra, by:

a.      Employing and arming Saabneh and the other security personnel at Joseph's Tomb on April 24, 2011;

b.      Retaining, promoting, and arming a convicted terrorist and selecting him to lead security personnel in one of the few locations where he was virtually certain to encounter

Israelis and Jews, thereby either intentionally or recklessly endangering the lives of visiting Israelis and Jews; and/or

      c.      Engaging in a policy and practice that incited, encouraged, and rewarded acts of terrorism against Israelis and Jews, as described more fully in paragraphs 36 through 42.

50.      Saabneh and the other PA security personnel under his command carried out the shooting attack while on duty working for the PA, at the post to which they were assigned by the PA, using weapons provided by the PA, and consistent with and in furtherance of the PA's goals and policies.  PA spokesman Adnan Damiri justified and ratified the attack in an interview on Israel Radio.  The shooting was therefore carried out by Saabneh and the other PA security personnel within the scope of their employment by the PA, and the PA is vicariously liable under *respondeat superior* principles for the attack.

51.      For all the reasons described in this Complaint, the PA is liable to Plaintiffs Yitzhak Safra, Natan Safra, and Yisrael Safra under 18 U.S.C § 2333(a).

52.      Plaintiffs Yitzhak Safra, Natan Safra, and Yisrael Safra request relief as described in the Prayer for Relief below.

**Second Claim for Relief**
**On Behalf of All Plaintiffs:**

**Aiding and Abetting International Terrorism Pursuant to 18 U.S.C. § 2333(a)**

53.      Plaintiffs repeat and incorporate the allegations contained in the previous paragraphs as though fully set forth and realleged herein.

54.      As described in paragraph 47, the April 24, 2011 actions of Saabneh and the other PA security personnel under his command constitute acts of International Terrorism within the meaning of 18 U.S.C. § 2333.

55.     The PA aided and abetted these acts of International Terrorism by employing and promoting a convicted terrorist (Saabneh), selecting him to lead other security personnel, posting him and his command at Joseph's Tomb, providing them with the authority of the PA government, and equipping them with automatic weapons that were used to injure and assault Yitzhak and Natan Safra.  The PA's actions were thus instrumental in enabling the injury and assault of Yitzhak and Natan Safra.

56.     By aiding and abetting Saabneh and the other security officers, the PA caused the injury and assault of Yitzhak and Natan Safra, and the resulting personal injuries of Yisrael Safra, described in paragraph 48.

57.     For all the reasons described in this Complaint, the PA is liable to Plaintiffs Yitzhak Safra, Natan Safra, and Yisrael Safra under 18 U.S.C § 2333(a).

58.     Plaintiffs Yitzhak Safra, Natan Safra, and Yisrael Safra request relief as described in the Prayer for Relief below.

### Third Claim for Relief
### On Behalf of Yitzhak Safra and Natan Safra:

### Battery

59.     Plaintiffs hereby give notice of their intention to rely on the law of the State of Israel.  *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 40 (D.D.C. 2010).

60.     Plaintiffs repeat and incorporate the allegations contained in the previous paragraphs as though fully set forth and realleged herein.

61.     In the April 24, 2011 machine gun attack, the PA's security forces employees knowingly used force to inflict harm on Yitzhak Safra and Natan Safra.

62.     Yitzhak Safra and Natan Safra did not consent to being shot at and wounded as they visited and attempted to leave Joseph's Tomb.

63.     For all the reasons alleged in this Complaint, the PA caused the shooting and resulting battery of Yitzhak Safra and Natan Safra.  The PA is therefore vicariously liable for the battery and also liable as an aider and abettor.

64.     The PA is liable for the full amount of Yitzhak Safra and Natan Safra's damages, in such sums as may hereinafter be determined.

65.     The PA's conduct was outrageous, extreme, wanton, willful, and malicious, and threatened and continues to threaten the public, warranting an award of punitive damages.

**Fourth Claim for Relief**
**On Behalf of Yitzhak Safra and Natan Safra:**

**<u>Assault</u>**

66.     Plaintiffs hereby give notice of their intention to rely on the law of the State of Israel.  *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 40 (D.D.C. 2010).

67.     Plaintiffs repeat and incorporate the allegations contained in the previous paragraphs as though fully set forth and realleged herein.

68.     The April 24, 2011 terrorist shooting and resulting carnage caused Yitzhak Safra and Natan Safra fear and apprehension of harm and death, and constitutes an assault on their persons.

69.     For all the reasons alleged in this Complaint, the PA caused the shooting and resulting assault on Yitzhak Safra and Natan Safra.  In turn, the PA also caused Yitzhak Safra and Natan Safra's ensuing extreme mental anguish, pain, and suffering.

70.     The PA is therefore liable, both vicariously and as an aider and abettor, for the full amount of Yitzhak Safra and Natan Safra's damages, in such sums as may hereinafter be determined.

71.     The PA's conduct was outrageous, extreme, wanton, willful, and malicious, and threatened and continues to threaten the public, warranting an award of punitive damages.

**Fifth Claim for Relief**
**On Behalf of All Plaintiffs:**

**Negligence**

72.     Plaintiffs hereby give notice of their intention to rely on the law of the State of Israel. *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 40 (D.D.C. 2010).

73.     Plaintiffs repeat and incorporate the allegations contained in the previous paragraphs as though fully set forth and realleged herein.

74.     Because the PA foresaw and/or could and should have foreseen that its conduct would cause Plaintiffs' injuries, the PA had a duty, both factually and notionally, to desist from engaging in, or authorizing and encouraging, acts of violence, and to refrain from deliberately and/or wantonly, and/or negligently authorizing or causing the infliction of injuries to persons such as Yitzhak, Natan, and Yisrael Safra.  The PA's conduct breached this legal duty.

75.     As a result of the PA's wrongful and/or unlawful and/or negligent acts, Yitzhak Safra and Natan Safra were injured and assaulted and Yisrael Safra suffered the harms described herein.

76.     The PA's breach of its legal duty created a foreseeable and unreasonable risk of injuries such as those suffered by Yitzhak Safra, Natan Safra, and Yisrael Safra.  Therefore, the PA's conduct factually and proximately caused Plaintiffs' injuries.

77.     The PA is therefore liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

78.     The PA's conduct was outrageous, extreme, wanton, willful, and malicious, and threatened and continues to threaten the public, warranting an award of punitive damages.

**Prayer for Relief**

WHEREFORE, Plaintiffs pray that this Court:

a.      Enter judgment against Defendant Palestinian Authority (also known as the Palestinian Interim Self-Government Authority) in favor of Plaintiffs for compensatory damages in an amount to be determined at trial;

b.      Enter judgment against Defendant Palestinian Authority (also known as the Palestinian Interim Self-Government Authority) in favor of Plaintiffs for punitive damages in amounts to be determined at trial;

c.      Enter judgment against Defendant Palestinian Authority (also known as the Palestinian Interim Self-Government Authority) in favor of Plaintiffs for treble damages;

d.      Enter judgment against Defendant Palestinian Authority (also known as the Palestinian Interim Self-Government Authority) in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees; and

e.      Grant such other and further relief as justice requires.

Respectfully submitted,

  /s/ Joseph B. Espo
Joseph B. Espo (D.C. Bar No. 429699)
Andrew D. Levy[*]
Jessica P. Weber[*]
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 1700
Baltimore, Maryland  21202-6701
Telephone:  (410) 962-1030
Facsimile:  (410) 385-0869
jbe@browngold.com
adl@browngold.com
jweber@browngold.com

---

[*] *Pro hac vice* motion to be filed.

Alan I. Baron (D.C. Bar No. 340273)
SEYFARTH SHAW LLP
975 F. Street, NW, Suite 100
Washington, DC 20004
Telephone:  (202) 828-3589
Facsimile:  (202) 828-5393
abaron@seyfarth.com

*Attorneys for Plaintiffs*

Dated:  April 21, 2014

## JURY DEMAND

Plaintiffs, through their undersigned attorneys, hereby demand a trial by jury on all issues

so triable pursuant to Federal Rule of Civil Procedure 38.

   /s/ Joseph B. Espo
Joseph B. Espo